**Application of William J. BUEHLER.**

**No. 74–613.**

United States Court of Customs
and Patent Appeals.

May 22, 1975.

Paul M. Craig, Jr., Washington, D. C., attorney of record, for appellant.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents, Henry W. Tarring, II, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

LANE, Judge.

This appeal is from the decision of the Patent and Trademark Office Board of Appeals affirming the rejection of all claims (8–14 and 23–28) in appellant's patent application serial No. 788,135, filed December 31, 1968, for "Method and Apparatus for Continuously Casting Wire or the Like." All claims were rejected on two grounds: (1) obvious subject matter under 35 U.S.C. § 103, and (2) double patenting of the "obviousness-type" wherein no terminal disclaimer has been filed. We reverse.

*The Invention*

Appellant's invention pertains to a method of continuously casting 55–Nitinol,[1] which is a specific titanium-nickel (Ti-Ni) alloy, into relatively small wire or flat ribbon shapes. According to appellant's brief, 55–Nitinol is a stoichiometric alloy possessing high ductility and other properties as follows:

> 55–Nitinol has many unique properties among which is its total non-magnetic characteristic, its non-corrosive characteristic and, above all, its ability

---

1. "Nitinol" is an acronym derived as follows: Ni is from nickel, Ti is from titanium, and NOL is from Naval Ordnance Laboratory at White Oak, Maryland, where this alloy was developed. "55" refers to 55% by weight of Ni in the alloy.

to convert heat into mechanical energy. If, for example, a thin wire of 55–Nitinol is deformed below its transition temperature and is then heated through its transition temperature, it will revert to its original shape with simultaneous release of mechanical energy.

The apparatus[2] employed in appellant's method is illustrated by Fig. 2 in the specification:

FIG. 2

Claim 23 is the sole independent claim (bracketed matter and reference numerals added):

23. A method for continuously casting molten TiNi-base alloys having of the order of 55% by weight of Ni into relatively small wire or relatively flat ribbon shapes by the use of a graphite crucible [11] directly adjoined by a metal die body [15] provided with a shape-forming orifice [18] comprising the steps of

[a] melting [by means of high frequency heating coils 70] the alloy in the graphite crucible within a non-contaminating environment utilizing the graphite crucible as susceptor for the TiNi-base alloy,

[b] cooling [by means of water in water passages 16 in metal die body 15] at least a part of the metal die body while forcing the molten alloy through its shape forming orifice [18], and

[c] continuously removing the cast alloy from the die.

The dependent claims add specific recitals of an evacuated environment, an

2. Claims reciting the apparatus have been withdrawn from prosecution by the examiner as drawn to a non-elected invention.

inert gas, heating the crucible while cooling the die, controlling heating and cooling to develop a temperature gradient, using an ingot of the alloy, initially forming a solid skull of alloy, and insertion of a stop plug into the die orifice.

Appellant's brief contains the following statement:

A few words concerning the historical development of the present invention is also believed desirable to place the same into proper perspective. Initially, the TiNi base alloys were made by the use of consumable or non-consumable arc casting, a method which had been successfully developed and applied in processing titanium. Since both nickel and titanium are highly reactive with various elements, including carbon, it was deemed impossible to use a graphite crucible in connection with making the alloy. However, in the course of further work, appellant discovered that though both the elemental components of Ti and Ni were each highly reactive with carbon and graphite, the alloy itself consisting essentially of these two elemental components was totally inert or non-reactive with carbon and graphite. This suggested to appellant the possibility that a graphite crucible might be used for making the alloy from its *elemental* components if a pre-alloyed material of the TiNi-alloy to be obtained is first placed into the graphite crucible, is then melted and the elemental components of TiNi are thereupon charged into the molten alloy while substantially preventing direct contact between the elemental component metals and the crucible walls. This approach proved successful and is the one described in appellant's U.S. Patent 3,529,958, which permitted the use of a graphite crucible in *making* the alloy from its *elemental* components of Ti & Ni, thereby obviating the inferior arc-casting process used hitherto which could not insure the necessary homogeneity of the ingot for products such as wires with identical properties, a prerequisite in

view of the effect of impurities or non-homogeneities on the transition temperature of the 55 Nitinol. [Footnotes omitted.]

Appellant emphasizes the fact that the claimed method requires the use of a *graphite* crucible which acts as a susceptor for the TiNi-base alloy. His specification employs the term "susceptor" in this way:

By being able to melt the alloy in a graphite crucible which represents excellent *susceptor* characteristics, it is possible to control the alloy temperature with sufficient precision in the crucible and in its passage through the graphite die-body to allow the formation and solidification of the wire. [Emphasis ours.]

Appellant's specification also contains the following statements relevant to the use of a graphite crucible:

Continuous casting methods of copper-base-type alloys are known in the prior art (U.S. Patent[s] 2,136,394 and 2,782,473). However, these methods and apparatus are not suitable for continuously casting a wire of a TiNi alloy, containing approximately 45% by weight of titanium, which in its elemental form is normally highly reactive, in particular with graphite.

\*       \*       \*       \*       \*       \*

An additional feature of the present invention is to be able to melt in a graphite crucible which constitutes a good susceptor in order to control the alloy temperature with such precision as to allow formation and solidification of the wire . . .. Normally, few medium temperature structure alloys are sufficiently inert in graphite, and certainly the iron base alloys and nickel base alloys are completely reactive with graphite.

Prior to the instant invention, the art knew that stoichiometric TiNi alloys could be made into wire by hot-rolling an ingot into a bar, hot-swaging the bar into a rod and then wire-drawing the rod. However, such prior art method of making TiNi wire is relatively uneco-

nomical and does not permit continuous production of the wire in any desired length.

## The References

The examiner and the board relied on five prior art references:

| | | |
|---|---|---|
| (1) Clark | 3,598,168 | Aug. 10, 1971 (Filed Oct. 14, 1968) |
| (2) Eldred | 2,242,350 | May 20, 1941 |
| (3) Heraeus (Great Britain) | 440,859 | Jan. 7, 1936 |
| (4) Howard et al. (Great Britain) | 1,013,851 | Dec. 22, 1965 |
| (5) Buehler et al. | 3,174,851 | March 23, 1965 |

The examiner and the board cited the *claims* of another reference for the purpose of establishing double patenting of the "obviousness-type":

| | | |
|---|---|---|
| Buehler | 3,529,958 | Sept. 22, 1970 (Filed Nov. 4, 1966) |

It should be noted that Buehler is *not* a *prior art* reference under 35 U.S.C. §§ 102 or 103. Furthermore, this Buehler patent (Buehler) should not be confused with the Buehler et al. patent (Buehler et al.), which is a prior art reference.

## The Rejections

The examiner rejected claims 8–14 and 23–28 under 35 U.S.C. § 103 as being "unpatentable over" Clark in view of Eldred, Heraeus, Howard et al. and Buehler et al. The board sustained this rejection and stated:

> [W]e find that the differences between the prior art and the process of the appealed claims are such *differences* as would be obvious to one skilled in the art armed with the disclosure of the applied references. [Emphasis ours.]

The examiner also rejected claims 8–14 and 23–28 "under the judicially-created doctrine of 'obviousness-type' double patenting over" the *claims* of Buehler in view of Eldred, Heraeus, and Howard et al. The board stated:

> Since we agree with the examiner that the presently claimed process is but an obvious variation, in the double patenting rather than in the 35 U.S.C. § 103 sense, of the process already called for by Buehler and, on the present record, is not allowable in view

of the prior art, we will sustain the examiner's rejection.

## Clark

The Clark prior art patent, entitled "Titanium Casting Process," discloses a method and apparatus for *batch* casting. In his "Description of the Prior Art," Clark states:

> Titanium alloys used in forming shaped castings are usually skull melted in water-cooled, crucible *arc* melting units. The temperature control in this type of melting is difficult because the molten titanium is cooled rapidly by the water-cooled crucible when power from the arc is terminated. A resulting variation in pouring temperature may cause many casting defects. If the temperature is too high, dimensional and metallurgical problems result. If the pouring temperature is too low, the castings misrun and also contain metallurgical defects.

> *One of the most serious problems in melting and pouring titanium* is the avoidance of contamination. Titanium has a *strong affinity* for hydrogen, nitrogen, oxygen and *carbon*. Excess absorbed hydrogen is removed from titanium alloys by expensive processing such as vacuum annealing. According to current specifications, the hydrogen content of titanium should be limited to about 125 and 200 parts per million. Above these limits, hydrogen embrittles most titanium alloys, and reduces their impact strength and notch tensile strength, causing brittle failure under sustained loads at low stresses. [Emphasis ours.]

In describing his invention, Clark states:

> The present invention is applicable to the melting and pouring of titanium alloys generally, where contamination is a problem. It is applicable to the melting of commercially pure titanium (99.2 percent Ti) as well as to alpha titanium alloys (Ti–5Al–2.5Sn) to alpha-beta titanium alloys (Ti–2Fe–2Cr–2Mo) (Ti–8Mn) (Ti–4Al–Mn) (Ti–4Al–3Mo–IV) (Ti–5Al–1.5Fe–1.4Cr–1.2Mo)

(Ti–6Al–4V) (Ti–7Al–4Mo) and to beta titanium alloys (Ti–3Al–13V–11Cr).

Clark's Fig. 1 is a sectional view of his apparatus:

Clark's apparatus 10 includes a graphite crucible 11 having a neck 12 providing a discharge opening 13. The graphite crucible 11 is positioned on a ceramic support plate 14 having an aperture 15 therein accommodating the neck 12 of the crucible. A cylindrical ceramic heat shield 16 is positioned about the graphite crucible 11 in coaxial relation. Surrounding the heat shield 16 is a high frequency induction coil 17 connected to a suitable source of power (not shown).

Overlying the discharge opening 13 is a disc 19 of titanium alloy, the disc 19 having a reduced thickness central portion 20. A slug 21 of the titanium alloy to be melted is supported in spaced relation to the walls of the crucible 11 as well as the disc 19 by a support rod 22

which is suitably fastened to the slug 21 by means of a threaded engagement. A thermocouple 23 is positioned centrally of the slug 21 to give an indication of the temperature at that portion of the slug.

Clark states that with induction heating, the heat buildup occurs on the outer surface adjacent to the induction coil 17 and progresses inwardly, mainly by conduction. The progress of the heating is monitored by the thermocouple 23. When the slug is uniformly heated to a temperature within say 100°F. of its melting point, full power is applied to the coil 17, and "melting is completed in a very short time." The molten metal is collected "momentarily" by the Ti alloy disc 19. The molten metal "rapidly

melts the disc 19," and proceeds through the discharge opening 13 into the gate 25 of a mold assembly for producing castings.

Clark concludes by stating:

It has been found through the use of the method and apparatus of the present invention wherein the slug is preheated without crucible contact that a *much shorter molten cycle results*, and *considerably less carbon contamination occurs.* [Emphasis ours.]

### Eldred

The Eldred prior art patent, entitled "Continuous Casting of Metal Shapes," discloses a method and apparatus for draw casting of metals where fluid metal is supplied to one end of an open ended mold, progressively cooled therein, and withdrawn from the opposite end of the mold in a congealed shape.

Eldred's Fig. 1, below, is a sectional view of his mold "suitable for casting copper, aluminum and their alloys."

Mold 1, of graphite or other refractory, is surrounded by steel casing 2, insulating material 3, and outer shell 4. Thermocouple 6 regulates the electrical current to heating element 5, thus maintaining the temperature surrounding mold 1 at a constant level. Chilling member 7 with fluid inlet 8 and outlet 9 is for "freezing" the metal. Pull-out rolls 12 remove formed casting 11. The boundary line between fluid and solid metal is shown at 13, and Eldred states that this freezing zone will vary in position according to the speed of withdrawal of the casting. Eldred desires a slow rate of cooling (removal of "superheat") in mold 1 and a high rate of cooling (removal of "latent heat") in chilling member 7. Thus, the patent states:

The fluid metal in the mold must, therefore, be prepared to freeze by very slow chilling or removal of its superheat, or when such superheat is dissipated further heat loss must be prevented until it progresses to the freezing zone where heat removal must proceed at a high rate, depending upon the rate of casting maintained.

\*        \*        \*        \*        \*        \*

With suitably maintained conditions, and a sufficiently long mold, the freezing will take place well in advance of the chilling member 7 and the casting, if of a suitable metal or metal mixture, will be comprised of long macro crystals oriented longitudinally of the casting. With a short die the crystallization will proceed necessarily in a more or less radial direction.

### Heraeus

This prior art reference discloses a melting furnace provided with a tap hole or discharge opening in a ceramic tubular body inserted in the bottom of the melting chamber which is surrounded by an induction coil. A metal plug in the tap hole is solid during the melting process and is then itself melted whereby the tap hole is opened.

### Howard et al.

This prior art reference teaches that after a metal charge is melted, gas under pressure may be used to aid in discharging the molten metal into a mold positioned below the melting chamber.

### Buehler et al.

This prior art reference discloses TiNi alloys, including the specific alloy 55–Nitinol, and states that: "The alloys, due to their high titanium content, may be melted by either consumable or non-consumable arc methods or the like employing a water-cooled copper crucible or hearth." The reference also indicates that the alloy has high ductility and can be worked into small diameter wire.

### Buehler

This *double patenting* reference claims a method of making TiNi alloys in a graphite crucible. The examiner and the board specifically referred to Buehler's claim 17:

17. A method for forming carefully controlled compositions of TiNi-base alloys reactive in their elemental form with a graphite crucible, comprising the steps of

[a] drying the crucible,

[b] placing on the bottom of the crucible at least one piece of a TiNi base alloy of predetermined composition,

[c] evacuating the melting chamber within the crucible to a predetermined vacuum,

[d] refilling the chamber partially to some predetermined pressure with an inert gas,

[e] heating the crucible to a temperature above the melting temperature of the piece of TiNi-base alloy,

[f] charging and melting the component metals of the alloy in the molten TiNi-base alloy in such a manner as to prevent direct contact between the component metals and the crucible walls and in such proportion that the molten alloy stays within such range as will not pick up substantial amounts of graphite from the crucible,

[g] maintaining the temperature in said chamber at a predetermined temperature above the melting point of the alloy,

[h] gradually reducing the pressure in said chamber, and thereafter

[i] *pouring the molten alloy for subsequent processing.* [Bracketed matter and emphasis ours.]

## OPINION

### The § 103 Rejection

■ The question is whether the cited prior art references establish that "the *differences* between the subject matter sought to be patented and the prior art are such that *the subject matter as a whole* would have been obvious at the time the invention was made to a person having ordinary skill in the art . .." 35 U.S.C. § 103 (emphasis ours).

As a matter of law, the board was imprecise when it stated that "the differences between the prior art and the process of the appealed claims are such *differences* as would be obvious to one skilled in the art . . .." (Emphasis ours.) The question under § 103 is whether the *subject matter as a whole* would have been obvious, not whether the *differences* would have been obvious. In re Van Venrooy, 412 F.2d 250, 253 n. 4, 56 CCPA 1199, 1203 n. 4 (1969). See also Harpman v. Watson, Comm'r Pats., 181 F.Supp. 919, 923 (D.D.C.1959), where the District Court stated:

This point, however, is but a single element in the attempt to take the plaintiff's invention apart bit by bit in order to show obviousness in each of its differences from the prior art. In determining patentability, however, we are not concerned with the obviousness *of each bit* when dissected out and after considering the applicant's disclosure, but with the obviousness of his *whole* invention as claimed. [Emphasis in original.]

■ After making the factual inquiries specified in Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)—i.e., determining the scope and content of the prior art, the differences between the prior art and the claims on appeal, and the level of ordinary skill in the pertinent art—we conclude that appellant's claimed subject matter *as a whole* is nonobvious.

Appellant's claims are limited to a "method for continuously casting molten TiNi-base alloys having on the order of 55% by weight of Ni into relatively *small wire* or relatively *flat ribbon* shapes by the use of a *graphite* crucible" (claim 23). In the claimed process, the molten alloy must necessarily be in contact with the graphite crucible for a substantial period of time. This is so because the alloy must be melted in the graphite crucible, the alloy temperature must be controlled with precision, and then the alloy must be forced through the relatively small shape-forming orifice in the metal die body.

The primary prior art reference, Clark, demonstrates that the person having ordinary skill in the art was concerned with the serious problem of avoiding contamination in melting and pouring titanium and high titanium alloys caused by titanium's "strong affinity" for carbon. It is well known that graphite is a crystalline form of carbon. Thus, Clark retains the molten metal in his graphite crucible only "momentarily," and he states his advance in terms of achieving a "much shorter molten cycle" and "considerably less carbon contamination."

Appellant's claimed method, however, involves doing what Clark tries to avoid—longer than "momentary" contact of molten titanium alloy with a graphite crucible. Appellant has invented a method for producing small wire or ribbon of 55–Nitinol when the prior art (Clark) strongly suggests that such a method would produce carbon contamination and unacceptable results. This is the very antithesis of obviousness. In re Rosenberger, 386 F.2d 1015, 55 CCPA 880 (1967). The *prior art* of record does

not teach or even hint at appellant's discovery that 55–Nitinol is essentially inert to graphite, and this explains the successful performance of the claimed method.

### The Double Patenting Rejection

■ The rejection of all appealed claims on the ground of double patenting of the "obviousness-type" is also unsound. The board pointed specifically to claim 17 of Buehler which recites a method of forming TiNi-base alloys. The method recited in that claim comprises, inter alia, the steps of charging and melting component metals, which are reactive in their elemental form with a graphite crucible, in a manner to prevent direct contact between the component metals and the graphite crucible walls, gradually reducing the pressure in the crucible, and "pouring the molten alloy for subsequent processing." The specification of Buehler may be used as a dictionary to learn the meaning of terms in the claim. In re Vogel, 422 F.2d 438, 57 CCPA 920 (1970). We find that the patent specification describes pouring the resulting molten alloy quickly into a mold after preheating the top of the graphite crucible to "promote proper ingot solidification." Thus, it is clear that the patented method of producing an alloy from component metals is quite different from appellant's claimed method for continuously casting a specific alloy into relatively small wire or relatively flat ribbon shapes by melting the alloy, cooling at least a part of the metal die body while forcing the molten alloy through a shape-forming orifice, and continuously removing the cast alloy from the die.

The law of double patenting was reviewed in In re Vogel, supra. The first question is whether the *same invention* is being claimed twice. By "same invention," we mean identical subject matter. It is self-evident here that identical subject matter is not involved.

The next question is whether any claim in the application defines merely an *obvious variation* of an invention

claimed in the patent. As stated in *Vogel* (422 F.2d at 442, 57 CCPA at 925):

> We recognize that it is most difficult, if not meaningless, to try to say what is or is not an obvious variation of a claim. A claim is a group of words defining only the boundary of the patent [property]. It may not describe any physical thing and indeed may encompass physical things not yet dreamed of. How can it be obvious or not obvious to modify a legal boundary? The disclosure, however, sets forth at least one tangible embodiment within the claim, and it is less difficult and more meaningful to judge whether that thing has been modified in an obvious manner. It must be noted that this use of the disclosure is not in contravention of the cases forbidding its use as prior art, nor is it applying the patent as a reference under 35 U.S.C. § 103, since only the disclosure of the invention claimed in the patent may be examined.

We conclude that the subject matter claimed in the present application is not a variation—much less an obvious variation—of the method steps, including the step of "pouring the molten alloy for subsequent processing," recited in claim 17 of Buehler. The claims on appeal do not involve batch casting of molten alloy in a mold, but rather they recite a method of continuous casting including the steps of forcing molten alloy through a shape-forming orifice in a partially cooled metal die body and of continuously removing the cast alloy from the die.

Accordingly, the decision of the board is reversed.

Reversed.

RICH, Judge, with whom MARKEY, Chief Judge, joins (dissenting).

I would affirm the rejection for obviousness under 35 U.S.C. § 103, and thus not reach the double patenting rejection.

We are here primarily concerned, of course, with the patentability of the principal claim, 23. In analyzing it, the board opinion says:

> From our analysis of the appealed claims, we find that claim 23, upon which all of the other claims either directly or indirectly depend, calls for the three steps of:
>
> 1. melting the alloy in a graphite crucible in a noncontaminating environment,
>
> 2. cooling at least a part of the die body while forcing the alloy through the shaped orifice, and
>
> 3. continuously removing alloy from the die.

To be more detailed in my discussion, I will change the board's view of the invention to regard it as a 4-step process:

1. *melting* the alloy in a graphite crucible,

2. *cooling* at least part of the die body,

3. *forcing* the alloy through the shape-forming orifice,

4. *removing* the alloy from the die.

The board's concise analysis of the examiner's rejection and its reasoning in affirming it are as follows (my emphasis):

> In rejecting the appealed claims, i.e., claims 8 through 14 and 23 through 28, as being unpatentable over Clark in view of Eldred, Heraeus, Howard et al. and Buehler et al., the examiner correctly took the position that *Clark* teaches using a plate of a TiNi-base alloy to be melted in a graphite crucible. The rest of the alloy, he asserted, is melted by induction heating and then, when the plate melts through, the metal is cast downward into a mold. In view of the *Eldred* disclosure, the examiner held it to be obvious that the casting step of Clark could be continuous casting. *As to the size* of the mold opening, the examiner was of the view that it would be *obvious to make the size of the mold opening the size of the desired product.*

It will be observed that the rejection of claim 23 is based on two references

only, Clark and Eldred, and the skill of the art, notwithstanding the discussion in the majority opinion of other prior art patents.

As for step 1, melting, appellant makes no claim to any novelty therein. His specification says it can be performed as taught by the prior art in these words:

The method according to the present invention involves the following steps:

A. Melting and alloying a near TiNi composition or cobalt-substituted TiNi ternary alloy of controlled transition temperature in the graphite crucible 11. This may be achieved in several ways:

1. Initially melting the alloy as disclosed in U. S. Patent 3,174,851 and casting the same in ingot form of predetermined shape; the ingot is then placed into crucible 11 and melted by induction heating; * * *.

He also says it can alternatively be performed as disclosed in Buehler patent 3,529,958, which issued on application serial No. 592,069. That patent is not technical prior art. The statement, which shows appellant did not consider any aspect of the melting step to be part of the invention herein claimed otherwise than as one step of a *combination* of steps, reads:

2. Melting the alloy in accordance with the preferred technique as described in U. S. Application Serial No. 592,069 by employing a graphite crucible. The melted alloy is then cast in a suitable mold, whereby the final solidified ingot will be preferably cast in a shape to fit the cross section of the graphite crucible 11 of Figure 2; the ingot is then again placed into crucible 11 and melted by induction heating; * * *.

If, as the majority appears to believe, melting 55–Nitinol in a graphite crucible

is an unobvious step in appellant's process, my answer is that Clark shows it is the most obvious way to melt. Let us remember that though the claims specify TiNi-base alloys, such alloys were known (Buehler et al.) and it was known to make wire from them. They are a species of titanium alloy, the subject matter of the Clark prior art patent, though Clark does not disclose nickel (Ni). He does disclose alloys of titanium (Ti) in various admixtures with aluminum, tin, iron, chromium, molybdenum, manganese, and vanadium. Furthermore, he clearly discloses the knowledge of the art that Ti has an affinity for hydrogen, nitrogen, oxygen, and carbon and the melting and pouring of Ti alloys under vacuum and in the presence of inert gas in an enclosure. He also discloses using a disc or skull in the bottom of the crucible. Clark's preferred crucible is "made of dense *graphite*." He casts from the bottom of his crucible.* Clark treats graphite crucibles as old in the art. Eldred, casting shapes continuously by chilling them in the cooling die, delivers molten metal from an electrically heated *graphite* mold. Melting in a graphite crucible thus appears to be the usual practice in the art. While no reference shows melting Ti-Ni alloys in graphite crucibles, which shows bare novelty in the claims, it is significant that appellant has not pointed out that Ti-Ni alloy is so different from Ti-(other metal) alloys as to call for different or unobvious melting techniques.

I cannot see why it would not be entirely obvious to anyone familiar with the melting of Ti-base alloys in graphite crucibles and desirous of making a continuous article such as a wire or thin rod or ribbon to follow the teachings of Eldred and flow the molten alloy out of the bottom of the crucible through a die of suitable size and shape which is provided with cooling means to remove the

---

* The relative term "momentary," used by Clark to describe the time during which his alloys remain in the crucible, is of little value in demonstrating the unobviousness of claim 23. The forcing step, as explained *infra*, is the obvious expedient for reducing the time the melt remains in the crucible.

heat from the metal to cause it to solidify in the die.

The steps of forcing the alloy through the shape-forming orifice and removing the alloy from the die are self-evident. As for the forcing step, *any* continuous casting process has to do this. Appellant recognizes that continuous casting is old in the art. Claim 23 describes the forcing step broadly; claim 25, as done by inert gas pressure. As to claim 23, appellant says the forcing is done merely by gravity: " * * * preferably, the weight of the charge in the crucible 11 will be used to act directly as a pressure head." There is nothing very unobvious there; sinks drain that way. The claim 25 gas pressure feeding limitation is taught in the prior art by Howard et al. There is no novelty in forcing metal out of the mold, whether by gravity or inert gas. Without the removing step, no article will be made. Besides, Eldred teaches drawing the formed article out of the cooling die by a pair of "pull-out rolls."

Thus I find the claim 23 method obvious from the prior art. What do the dependent claims add? The board opinion continued (my emphasis):

> The examiner next applied *Heraeus* to show that it is *known to use a plug* to stop up the bottom of the melting crucible, if so desired. *Howard et al.* was then applied for its teaching of *applying inert gas to the melt in a crucible to assist the feeding* of the liquid into the molding area. *Buehler et al.*, the examiner thereafter asserted, *teaches that a TiNi-base alloy* as recited by appellant *is old and that such an alloy is conventionally melted using vacuum arc melting as taught by Clark.* The examiner then drew the further conclusion that the alloy of Buehler et al. could be melted in the manner taught by Clark [by induction heating]. We agree with both the examiner's reasoning and his conclusion. Therefore, we will sustain his rejection of the appealed claims on this ground.

Appellant has not seriously relied on any of the limitations of his dependent claims to show patentability but has argued them all together. They fall with claim 23. I find no error in the board's reasoning, and would affirm the board's decision affirming the rejection of the dependent claims as well.

I agree with the majority on the legal test to be applied. The board erred when it stated, " * * * the differences between the prior art and the processes of the appealed claims are such differences as would be obvious to one skilled in the art armed with the disclosures of the applied references." The *decision* of the board, however, is correct for the reasons given above. To recapitulate: the subject matter of claim 23 is at best the combination of the four steps set forth above. The steps are all old. The TiNi alloy is old, making it into wire is old, and continuous casting of molten metals is acknowledged in appellant's specification to be old. What then is new in the combination? Comparing appellant's crucible with Clark's crucible as shown in the drawings reproduced by the majority, I note they are both induction furnaces with graphite crucibles (Clark's crucible is 11). Both discharge from the bottom; both are casting Ti alloys. Both can use vacuum or fill the enclosed space around the crucible with inert gas. Obviously, the pressure of the gas must be under *control* and hence can be adjusted to any desired pressure. So what difference is there? Only casting through a cooled die instead of freely into a mold. The bottom of appellant's mold and his cooled die body function in the same way as the bottom of Eldred's graphite mold 1 and his "[c]hilling means for freezing the metal," designated 7. If there is any significant difference between Eldred's cast rod 11 and appellant's wire 20, it is not self-evident.

Therefore, the "subject matter as a whole" amounts to putting Eldred's mold-die combination at the discharge opening 13 of Clark's crucible, in place of his mold 25, to cast wire instead of ingots. Looking at the claimed subject

matter as a whole. I think it would clearly have been obvious to those in the Ti-alloy casting art, within the meaning of § 103, from the disclosures of the cited references.

