## In re Walter KASLOW and Uniform Product Code Council, Inc. (UPPC), Intervenor.

### Appeal No. 82-599.

United States Court of Appeals, Federal Circuit.

May 17, 1983.

Michael Ebert, New York City, argued for appellant.

Thomas E. Lynch, Arlington, Va., argued for U.S. Patent and Trademark Office. With him on the brief were Joseph F. Nakamura, Sol. and Jere W. Sears, Deputy Sol., Washington, D.C.

Darryl Mexic, Washington, D.C., argued for intervenor. With him on the brief was Robert G. McMorrow, Washington, D.C.

Before BALDWIN, Circuit Judge, SKELTON, Senior Circuit Judge, and KASHIWA, Circuit Judge.

KASHIWA, Circuit Judge.

This is an appeal from the decision of the Patent and Trademark Office Board of Appeals (the "Board") sustaining the examiner's rejection of claims 1–4 and 6 in application Serial No. 684,408, filed May 7, 1976, entitled "Coded Merchandising Coupon." This application is a division of appellant's application, filed December 13, 1974, which issued as U.S. Patent No. 3,959,624 on May 25, 1976. The claims were primarily rejected as obvious under 35 U.S.C. § 103[1] in view of public use evidence in combination with a prior art reference. The claims were also rejected as being drawn to new matter under 35 U.S.C. § 132,[2] although this rejection was treated as if it had been made under the first paragraph of 35 U.S.C. § 112.[3] We affirm.

1. 35 U.S.C. § 103, in pertinent part, states:
   A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

2. 35 U.S.C. § 132 states:
   Whenever, on examination, any claim for a patent is rejected, or any objection or requirement made, the Commissioner shall notify the applicant thereof, stating the reasons for such rejection, or objection or requirement, together with such information and references as may be useful in judging of the propriety of continuing the prosecution of his application; and if after receiving such notice, the applicant persists in his claim for a patent, with or without amendment, the application shall be reexamined. No amendment shall introduce new matter into the disclosure of the invention.

3. 35 U.S.C. § 112, in pertinent part, states:
   The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

## I

Appellant's invention relates to a method and system for redeeming discount coupons automatically at a retail store's checkout counter. The coupons are used to reduce the purchasing price of consumer items commonly found in retail stores such as supermarkets. The system disclosed employs an existing optical scanner and computer system, the IBM Supermarket System. The discount coupon disclosed is impressed with a Universal Product Code (the "UPC") symbol and a recognition code symbol.

The UPC symbol is a series of light and dark parallel bars which represent 10 digits. The bars are grouped into two groups, generally referred to as "5-by-5," with each group representing five digits. One group of five identifies the manufacturer of consumer items; and the other group identifies a particular consumer item. The "5-by-5" bar code symbol is best illustrated as follows: [4]

The recognition code symbol, also in the UPC bar code format, identifies the item the symbol is impressed on as the discount coupon. In addition, the symbol identifies the amount of the discount.

Appellant's invention is best described by his independent claims:

1. The method of redeeming merchandise coupons issued by various manufacturers which promise specified discounts on certain consumer items produced by these manufacturers and sold in supermarkets, each item bearing a distinctive symbol based on the universal product code in which five digits identify the manufacturer thereof and another five digits identify the specific item, said method comprising the steps of:

A impressing on each coupon a universal product code symbol which corresponds to the symbol appearing on the merchandise item to which it is related and a recognition code symbol representing the coupon;

B storing in a memory at each supermarket carrying said certain consumer items, redemption signals representing the product code symbols borne by the consumer items which are subject to said discounts;

C optically scanning the product code and recognition symbols borne by the coupons offered for redemption at each of said supermarkets to produce coupon signals and recognition signals;

D comparing each coupon signal derived from a coupon with the stored redemption signals in the memory to determine whether a match exists between the coupon signal and one of said stored redemption signals and thereby avoid misredemption of the coupon, the comparison being rendered effective only if the coupon signal is accompanied by a recognition signal;

E summarizing the coupons redeemed during a predetermined period at each of said supermarkets to provide data relating to the various manufacturers identified in the redeemed coupons and to the number of redeemed coupons assigned to each of these manufacturers; and

F transmitting the summarized data obtained at each supermarket to a central computer linked to said supermarkets to provide an audit of the overall volume of coupon traffic at these supermarkets and

---

4. For example, a first group representing the numerals "16000" would identify General Mills as the manufacturer of the consumer goods. Similarly, "38000" identifies Kellogg's and "43000" identifies Post. The second group, however, has a dual function, *i.e.*, identification of both the particular consumer item and the size or weight of that item. For example, the numerals "16000 66410" identify a 7-ounce box of General Mills' Cheerios breakfast cereals. "16000 66510" and "16000 66610" identify the 10-ounce and 15-ounce box of Cheerios, respectively.

the relative trading-in of coupons issued by the various manufacturers.

\* \* \* \* \* \*

3. In a system for redeeming merchandising coupons issued by various manufacturers to provide discounts on certain consumer items produced by these manufacturers which are sold in supermarkets, each coupon having a universal product symbol printed thereon in which five digits identify the manufacturer of a consumer item and another five digits identify the item and grants a specified discount with respect to a consumer item which bears the same symbol, each coupon also having a recognition code symbol printed thereon representing the coupon, the combination comprising:

A an optical scanning unit at each of said supermarkets carrying said certain items to scan the symbols on each of said coupons to produce a coupon signal and a recognition signal representative thereof;

B a terminal at each of said supermarkets including a memory which stores redemption signals representing the consumer items subject to discount by said coupons, means activated by the recognition signal to compare the coupon signal produced by each scanned coupon with each of the stored redemption signals to determine whether a match exists between the coupon signal and one of the stored redemption signals and to indicate the existence of a match authorizing a coupon redemption, and means to summarize the coupons redeemed during a predetermined period to provide data relating to the various manufacturers identified in the redeemed coupons and to the number of redeemed coupons assigned to each of these manufacturers; and

C means to transmit the summarized data obtained at each supermarket to a central computer linked to said supermarkets to provide an audit of the overall volume of coupon traffic at these supermarkets and the relative trading-in of coupons issued by the various manufacturers.

II

The Uniform Product Code Council, Inc.[5] (the "UPCC"), the intervenor in the present appeal, adopted a 10-digit UPC code in 1970.[6] As part of its process of selecting a UPC symbol, the intervenor published a booklet in May, 1973, the *UPC Symbol Specification.* In that booklet an exemplary bar code symbol, the symbol shown previously, was fully illustrated and described. Subsequently, this well-known bar code symbol was formally adopted by the intervenor for use on products in April, 1974. The intervenor, however, did not adopt the use of this UPC symbol on coupons as of the effective filing date of appellant's application, December 13, 1974.

Participating in the UPC symbol selection process, RCA in 1972 submitted a brochure which showed its proposed UPC symbol, the RCA Bullseye symbol. The Bullseye symbol is best illustrated as follows:

1234567890

The RCA brochure stated that the use of its symbol was for both products and coupons.

5. UPCC is a tax exempt non-governmental membership corporation organized for the purpose of standardizing the use of the UPC symbol and codes among grocery retail outlets, food manufacturers and distributors, members of the equipment industry who make or desire to make apparatus which can read and process the UPC symbol and codes, and members of the printing industry.

6. Intervenor's involvement in the present case is discussed more fully at III and IV, *infra.*

Moreover, RCA also disclosed its version of the bar code symbol in the brochure.[7]

To demonstrate the feasibility of its coupon redemption system, RCA, in conjunction with the Kroger supermarket chain and Proctor & Gamble, successfully operated such a system in early 1973 at a Kroger supermarket in Kenwood (Cincinnati), Ohio. The discount coupons used, issued by Proctor & Gamble for four of its products,[8] were marked with the RCA Bullseye symbol. The RCA symbol used a 1–7–2 code—the first digit indicated whether the item is a product or coupon and the next seven digits identified the particular product.[9] For example, a "0" in the first digit indicated that the scanned item is a product; and a nonzero indicated that the scanned item is a coupon. In addition, each nonzero numeral also represented a specific amount of the discount, e.g., "1" could represent a 5¢ discount, "2" a 10¢ discount, and "3" a 25¢ discount.

The RCA computer system included five or six checkout stands connected to a central computer, all of which were located in one supermarket. Each checkout stand included an optical scanner, a display, a keyboard, a printer, and a cash register terminal having a "string" memory and a comparator. In operation, products were optically scanned first and the Bullseye symbol on each item caused the name of the item and the price of that item to be retrieved from the computer memory and shown on the display and stored in the "string" memory. Next, a coupon was optically scanned and the first digit of that Bullseye symbol would trigger a comparator that compares the 7-digit product identification symbol on

the coupon with a list of product identification numbers held in the "string" memory. If a match was made, then the amount of the discount was retrieved from the computer memory and shown on the display and registered by the terminal. If a match was not found by the comparator, then the coupon was dishonored and this occurrence entered in the terminal. There were daily and weekly summaries made and sent to the single manufacturer, Proctor & Gamble. The summary for each coupon item, generated by the computer, included redemptions and attempted misredemptions, misredemption being a crediting of a discount to a customer who did not purchase the product to which the discount applied.

A similar prior art system is IBM's 3660 Supermarket System a brochure for which is incorporated by reference into appellant's application. Each checkout stand of this system includes an optical scanner and a terminal. The optical scanner, which is capable of reading the "5-by-5" UPC symbol, sends a signal corresponding to the UPC code to the terminal which in turn automatically retrieves the item's name and price from its memory and displays them. Moreover, the 3660 System includes a supermarket controller that supervises up to 24 terminals and scanners and provides price look-up and item movement data on over 20,000 different items. At the end of the day or at any convenient time, summarized data may be transmitted to a central computer at the headquarters of the supermarket chain.

Additional prior art references, a magazine article [10] and a newspaper article, are

7. The bar code symbol proposed by RCA is as illustrated:

8. Ivory Liquid, Pringles Potato Chips, Tide and Charmin.

9. The exact use of the last two digits is not clear. They are, however, not related to coupon redemption.

10. "What's Behind The Coupon Boom," *Progressive Grocer,* Nov., 1974, pp. 59–64.

also incorporated into appellant's application—the former discusses the problem of coupon misredemption and the latter estimates that $100 million a year is lost through coupon misredemption.

### III

Subsequent to the issuance of appellant's parent application, U.S. Patent No. 3,959,-624, the UPCC instituted a declaratory judgment action against the appellant regarding the issued patent in the U.S. district court.

Following a denial by the district court of appellant's motion to dismiss,[11] that action was stayed pending the outcome of the present case. Simultaneous with the filing of the civil action, the intervenor filed a petition to institute a public use proceeding [12] against appellant's instant application.

### IV

In the public use proceeding, the intervenor asserted that appellant's invention was unpatentable as obvious in light of prior public use, the RCA-Kroger supermarket system demonstration. The examiner found, *inter alia,* that (1) the RCA system provided a printed summary of coupon redemption and misredemption for each product; (2) the "5-by-5" UPC symbol and several symbol variations were disclosed to the public in April, 1973; (3) as of December 13, 1974, no UPC-coded symbol for coupons had been adopted and no system was processing UPC-symboled discount coupons; and (4) the RCA system was capable of printing summaries of data such as summaries by products, by product size, by manufacturer, by date, and by terminal.

In his decision dated July 7, 1980, the examiner barred appellant's application on the ground of prior public use. His conclusions of law are as follows:

It is concluded that the substitution of the UPC 5–5 code symbol recited in the

preamble of claims 1 and 3 of Kaslow for the RCA 1–7–2 code symbol for product identification, and with a coupon identifying character added (one of Kaslow's equivalent, alternate arrangements), would be an obvious variant to the process and system demonstrated in the public test conducted in the Kenwood, Ohio, Kroger supermarket in early 1973.

It is also concluded that the summarizing step of section E of claim 1 and summarizing means of section B of claim 3 in which a general purpose computer produces summaries of data regarding redeemed coupons categorized by manufacturer rather than summaries of coupon redemption data categorized by product as was done in the Kroger Kenwood demonstration in February to. June of 1973 would be an obvious matter of choice to a person skilled in the art.

That aside from these obvious variants, everything recited in the claims of this application has been established to have been shown in the Kroger Kenwood public demonstration in 1973 more than one year before the filing of the parent application of this application.

It is concluded that the claims in this application, as amended, are barred on the grounds of public use or sale more than one year prior to the filing of the application under 35 U.S.C. 102(b) and 103.

### V

Following the public use proceeding, the appellant amended his claims to emphasize that the memory at each supermarket shall identify discount coupons according to individual manufacturer and transmit this data from each supermarket to a central computer in order to provide an audit. This procedure would therefore eliminate the need for clearinghouses and prevent retailer fraud.

---

11. *Uniform Product Code Council, Inc. v. Kaslow,* 460 F.Supp. 900, 203 USPQ 264 (S.D.N.Y. 1978).

12. *See* 37 C.F.R. § 1.292; MPEP §§ 720–720.-05. *See also* 35 U.S.C. § 102(b). Section 102(b), in pertinent part, states:
A person shall be entitled to a patent unless—

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *.

In the conventional procedure, the supermarket or the supermarket chain would forward bundles of coupons to a clearinghouse. After manually separating the coupons by manufacturer and/or product, the clearinghouse would credit the account of the supermarket (chain) and forward the coupons to the manufacturers.

The examiner, in his final office action, rejected the claims under 35 U.S.C. § 132 as being drawn to new matter in that the amendments to claims 1 and 3 are not supported by the original disclosure. He stated:

> In referring to the supplemental IBM materials applicant is compelled to argue that his invention is predicated on what the IBM means might be imagined as inherently capable of doing without any details or modifications set out in the specification as required by section 112. The amendments new [sic] proposed are simply not supported by the original disclosure.

The examiner also rejected the claims at bar under sections 102(b) and 103 as barred by public use more than one year before the effective filing date in view of the public use evidence. The examiner stated:

> The Kroger Kenwood demonstration had but a single manufacturer, however the RCA terminal and computer broke down the discount coupons into specific item classes and these items classes were further broken down to specific items by weight with specific discounts and the result were printed out by item at specific intervals. Viewing applicants [sic] broad disclosure and reliance on the IBM technology, it would be fair to say that the Kenwood demonstration could have broken down the items to various manufacturers if more had been involved and that the plurality of terminals need not have been located in a single store.

## VI

The Board affirmed both of the examiner's rejections. The Board, however, treated the section 132 rejection as if it had been made under the first paragraph of section

112. *See In re Rasmussen,* 650 F.2d 1212, 211 USPQ 323 (Cust. & Pat.App.1981). The Board believed that the sole ground for sustaining the section 132 rejection was the failure of appellant's specification to describe the claimed audit feature. The Board stated:

> We do * * * agree with the examiner that the disclosed method and apparatus do not "provide an audit" of overall coupon traffic and of redeemed coupons of the various manufacturers. The appellant does say * * * [in] the specification that the present invention simplifies auditing procedures. However, there is a considerable difference between simplifying auditing procedures and providing an audit. As pointed out by the examiner, an audit requires examination and verification of records for accuracy. The present invention, as disclosed, may aid in the auditing process, but it does not provide an audit. The appellant provides another dictionary definition * * * [in] the reply brief. However, it is not apparent to us that the present invention provides a methodical examination and review of a situation or condition in a business enterprise concluding with a detailed report of findings. Merely summarizing data regarding redeemed coupons hardly constitutes an audit in accordance with the definition provided by the appellant. * * * [T]here is simply nothing in the appellant's disclosure suggesting the use of the present invention as an electronic clearing house.

## OPINION

The appellant primarily argues that the Board erred in holding all claims unpatentable under section 103 in view of the public use evidence and the *UPC Symbol Specification* booklet. The appellant also argues that the Board erred in holding all claims as being drawn to new matter under section 132 (treated as if rejected under section 112) due to appellant's alleged failure to describe the claimed auditing feature in his application.

## I. *Obviousness*

First, the appellant contends that his application disclosed the source of a problem and his invention solved that problem, the disclosed problem being retailer fraud and manual clearinghouse operations. To buttress the retailer fraud argument, the appellant cites the *Progressive Grocer* magazine article for the proposition that the coupon misredemption problem lies with the retailers. In addition, appellant's specification discusses the existing clearinghouse operations of manually sorting coupons which have been received from various retailers. Accordingly, appellant's invention would eliminate the identified problem of retailer fraud and manual clearinghouse operations.

Next, the appellant contends that combining the public use evidence with the *UPC Symbol Specification* booklet would not produce the claimed invention. Further, the appellant contends that the claims at bar, citing *In re Corcoran,* 640 F.2d 1331, 208 USPQ 867 (Cust. & Pat.App.1981), do not completely read on a hypothetical arrangement created by combining the RCA system in view of the *UPC Symbol Specification.* In support of the latter contention, the appellant argues that, *inter alia,* the *UPC Symbol Specification* was not concerned with the processing of coupons; the RCA Bullseye code was a private code; the RCA Bullseye code did not identify the manufacturer; the RCA system did not provide a summary of the coupons broken down in accordance to manufacturers; and the RCA system did not employ a central computer which linked several supermarkets. We, however, disagree.

In reviewing decisions of the Board which are based on section 103 obviousness grounds, our focus must be whether "the differences between the subject matter sought to be patented and the prior art are such that the *subject matter as a whole* would have been obvious at the time the invention was made." [Emphasis added]. 35 U.S.C. § 103. *See Graham v. John Deere Co.,* 383 U.S. 1, 13, 86 S.Ct. 684, 691, 15 L.Ed.2d 545 (1966); *Lockheed Aircraft Corp. v. United States,* 553 F.2d 69, 77, 213 Ct.Cl. 395, 193 USPQ 449, 454 (Ct.Cl.1977); *In re Buehler,* 515 F.2d 1134, 1140, 185 USPQ 781, 786 (Cust. & Pat.App.1975). Moreover, the discovery of the source of a problem is a part of the "subject matter as a whole" inquiry. In *In re Sponnoble,* 405 F.2d 578, 585, 56 CCPA 823, 160 USPQ 237, 243 (1969), the Court of Customs and Patent Appeals stated:

> It should not be necessary for this court to point out that a patentable invention may lie in the discovery of the source of a problem even though the remedy may be obvious once the source of the problem is identified. This is *part* of the "subject matter as a whole" which should always be considered in determining the obviousness of an invention under 35 U.S.C. § 103. [Emphasis in original].

*See also In Re Peehs,* 612 F.2d 1287, 1290, 204 USPQ 835, 837 (Cust. & Pat.App.1980).

We agree with the Board that appellant's specification does not support the argument that he discovered the source of a problem—retailer fraud. Appellant's specification only mentions the problem of misredemption fraud committed by consumers, local charitable groups, check-out clerks, and retail store managers. The *Progressive Grocer* article describes, in addition to the previously mentioned groups, the trash collectors. Retailers and supermarket chains, however, are mentioned only in relation to the "retailer in-ad" coupon problem.[13] Thus, appellant's application fails to describe or suggest the elimination of the retailer fraud problem.

We also agree with the Board that appellant's invention fails to eliminate the problem of manual clearinghouse operations. Appellant's specification merely describes the typical clearinghouse operations and the considerable cost associated with such operations. In reading the specification in the light most favorable to the appellant, we

---

**13.** Retailer in-ad coupons are coupons issued by retailers which permit the consumer to redeem specified brand-name product items. Appellant's argument, however, deals with the problem of retailers misredeeming coupons *issued by manufacturers.*

find summarized data may be transmitted from each supermarket controller to a central computer at the headquarters. We do not believe one skilled in the art would conclude that the retailer would bypass the clearinghouse and submit the summarized data to the manufacturer in lieu of the redeemed coupons.

Accordingly, we fail to find a clear indication that the appellant discovered the source of the problem. *See Sponnoble,* 405 F.2d at 585, 160 USPQ at 243. As the Court of Customs and Patent Appeals said in *In re Wiseman,* 596 F.2d 1019, 1023, 201 USPQ 658, 661 (Cust. & Pat.App.1979), ▮n contrast, in the present case we find only the reiterated statement of counsel that appellants discovered the source of the problem. There is, however; nothing of record to substantiate the assertion.

As for appellant's contentions that the public use evidence combined with the *UPC Symbol Specification* booklet would not produce the claimed invention and the claims at bar do not read completely on the combination, we also disagree.

▮ In a section 103 inquiry, the focus is not just on the differences between the claimed subject matter and the prior art, but rather on the subject matter as a whole. *See Buehler,* 515 F.2d at 1140, 185 USPQ at 786. Although the appellant has submitted a litany of differences between the hypothetical combination and his claimed invention, we must focus on his claimed invention as a whole. *See In re Gulack,* 703 F.2d 1381, 217 USPQ 401 (Fed.Cir.1983).

The RCA-Kroger system included all features of the claims at bar except for the requirements of multiple supermarkets, the use of the UPC "5-by-5" symbol on coupons, and the central computer at the headquarters of the supermarket chain. Since the RCA-Kroger system was a public use or on sale bar under 35 U.S.C. § 102(b), it is "prior art" under section 103. *See Corcoran, supra.* Moreover, the appellant has misplaced the emphasis of *Corcoran.* Whereas the appellant believes that *Corcoran* stands for the proposition that his claims at bar must read completely on a prior art combi-

nation, the *Corcoran* holding is that a public use or placing on sale under section 102(b) is "prior art" which may support an obviousness rejection under section 103.

Since the fundamental teaching of the RCA-Kroger system is automatic coupon handling between the consumer and the retailer, the fact that the RCA Bullseye code was a "private" code is not significant. Moreover, the appellant does not appear to contest the Board's holding that it would have been obvious to substitute the UPC "5-by-5" code for the RCA Bullseye code after the UPCC's selection and publication of the UPC symbol in 1973.

Contrary to appellant's contention, the RCA-Kroger system and code did identify the manufacturer of the consumer items, albeit only one manufacturer, Proctor & Gamble. Further, the summary data of redemptions and misredemptions grouped by product inherently identified the manufacturer. Distinguishing the claims at bar from the device in public use on the ground that only a single manufacturer provided coupons is not convincing. The fact that only one manufacturer was involved in issuing coupons did not alter the means or method steps disclosed in the public use proceeding and does not alter their anticipation of the corresponding means and method steps in the claims at bar.

Even if appellant's claims are read to require the summarized data to include a single identifier and a single total of redeemed coupons for each manufacturer, appellant's invention as a whole would have been obvious since the collating and sorting of information is conventional for a computer. For example, the IBM 3660 has summarization capability. Further, adding a central computer to a plurality of supermarkets each of which having a RCA-Kroger system also would have been obvious. Since the IBM 3660 brochure disclosed the means and method of forwarding data to a headquarters, the placement of RCA-Kroger systems into several supermarkets would not have been unobvious. *See Alco Kar Kurb, Inc. v. Ager,* 286 F.2d 931, 128

USPQ 269 (3d Cir.1961); *In re Long,* 153 F.2d 110, 33 CCPA 797, 68 USPQ 169 (Cust. & Pat.App.1946).

■ After considering the prior art evidence and references in their entirety for all they teach and suggest,[14] we hold appellant's claimed invention as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art.

## II. *New Matter*

The appellant also contends [15] that the claim language "to provide an audit," which appears in his claim 1 paragraph F and claim 3 paragraph C, is supported by the following passages in his specification:

> More particularly, it is an object of the invention to provide a merchandise coupon having UPC indicia thereon which minimizes the possibility of misredemption and affords a running account of the number of valid coupons accepted, thereby simplifying *auditing and redemption procedures.*
>
> With the present invention, the summarized data may include data relating to the coupons honored in the various stores linked to the central computer, *so that a check may be made* on the overall volume of coupon traffic and the relative trading in of coupons issued by various manufacturers. [Emphasis added].

■ We disagree. As the Board in the instant appeal correctly said:

> The test for determining compliance with the written description requirement is whether the disclosure of the application as originally filed reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter, rather than the presence or absence of literal support in the specification for the claim language. *In re*

*Edwards,* 558 [568] F.2d 1349, 196 USPQ 465 (CCPA 1978); *In re Herschler,* 591 F.2d 693, 200 USPQ 711 (CCPA 1979). The content of the drawings may also be considered in determining compliance with the written description requirement. *In re Barker,* 559 F.2d 588, 194 USPQ 470 (CCPA 1977). [Emphasis in original].

Appellant contends that the word "check" [16] in the previously mentioned quote and the word "audit" in his claims mean the same thing. However, the latter passages of the quote do not describe any particular auditing or checking procedure to be carried out as part of the invention. Rather, they merely state that the information obtained by the invention might be used in some unspecified way to simplify auditing or to check on coupon volume. The claim language, on the other hand, implies that there is some mechanism or step which is a part of the invention and which performs an audit on the data transmitted to the central computer. Nowhere in the specification is either the step or method of performing an audit on the summary information described.

In addition, appellant contends that since an audit is a verified statement and the checkout system only accepts those coupons that matched the products purchased, its summary of coupons redeemed is a verified statement. Accordingly, the summary is an audit. However, if the summary is the audit, as the appellant urges, what is the step and means claimed for providing the audit? Since the claims recite transmitting the summary data to a central computer to provide an audit, the implication is that the audit takes place after the transmission of the data. This, however, is inconsistent with appellant's position that the summary data itself is the audit. Moreover, this contention is also not supported by the specification.

14. *See In re Wilder,* 563 F.2d 457, 195 USPQ 426 (Cust. & Pat.App.1977); *In re Umbricht,* 404 F.2d 386, 56 CCPA 772, 160 USPQ 15 (Cust. & Pat.App.1968).

15. The appellant does not contest the basis of the Board's decision—treating the new matter

rejection under 35 U.S.C. § 132 as if made under the first paragraph of 35 U.S.C. § 112.

16. Appellant now offers, as he had to the Board, to substitute the word "check" for "audit" in his claims. We, however, will make no comments on this proposition.

**1376**

We, therefore, hold appellant's claims are not supported by the specification.

Since the claims are not separately argued, they all stand or fall together. *See In re Burckel,* 592 F.2d 1175, 201 USPQ 67 (Cust. & Pat.App.1979). Accordingly, we hold the Board committed no reversible error and its decision is affirmed.

AFFIRMED.